We have four cases in the calendar this morning. A trade case from the Court of International Trade, two patent cases from District Courts, and an unusual case from the Patent Office Trademark Trial and Appeal Board on Certification of Marks. Our first case is TSC VSMPO-AVISMA Corporation v. United States and U.S. Magnesium, 2012-1076. Mr. Gurley. Good morning. May it please the Court, my name is John Gurley representing AVISMA, which would be the shorthand name for the company. I'm going to discuss today some of the margins and prices that we had earlier made confidential in our pleadings, but to expedite the discussion today, we're going to make them public today's discussion. That's wise. Your Honor, if I may, Steve Jones on behalf of U.S. Magnesium. We prepared today for a public hearing and we believe it would not be fair for Mr. Jones' case. We didn't prepare for a hearing in which those data would be made public. Mr. Gurley could have requested a closed hearing, he did not. So we would object to Mr. Gurley making that information public this morning. Perhaps if this wasn't dealt with in advance, you ought to limit yourself and avoid confidential information. I think, Your Honor, that some of the data is margin numbers, which actually don't reflect the cost of production. I hope that counsel would stipulate that I can use the word margins and range of margins. That's fine. Would you restart the clock, please? Margin information, Your Honor. As long as that information is on the public record, we have no objection. I'm talking about actually the dumping margins in the case. So they might have been at certain times bracketed, but they're actually not the names of customers or they're not secret cost of production information. They're actually dumping margins that are now six years old. So I'm assuming that using that kind of numbers would not be a burden on counsel for intervening. Again, as long as that information is already on the public record, we have no objection. For example, the 43.58% rate that was used here. What's the problem with mentioning the dumping margins? That's not confidential, is it? There's much too much marking of stuff that's confidential. There are dumping margins that were calculated in this case that Mr. Gurley is arguing should be used instead of the 43.58% rate. Those dumping margins have not been made public, Your Honor. How would you like me to proceed? I'm all about transparency. I'll only mention that which is publicly known. Okay. I hope I inadvertently, anyway. Thank you, Your Honors. This is a unique case where the department utilized an AFA rate based upon a single transaction out of 141 transactions. And that single rate was an outlier that was significantly higher than any other margin on the record. Isn't that substantial evidence? That is not substantial evidence, Your Honor. This was secondary information from a prior review. So in any of the cases where corroboration is required, the information they use and the data that they select must have a meaningful and logical relationship to the facts of the record. And the conclusions they draw must be reasonable. But the Court of International Trade sent this back again, didn't it, for corroboration? How many times does this have to go back and forth? As many times as it takes to get the decision right, Your Honor. They sent it back to the Department of Commerce and told them, actually invited them to use a PAM style analysis. Because traditionally in AFA cases, the department has been forced oftentimes by this court or other courts to find a big grouping of transactions so that you're not just using the highest transaction. They're looking for high volume transactions. Here, Judge Rastani was inviting them to do that. Instead, they came back with a novel, what we believe to be flawed methodology, in which they used 07-08 import statistics to try to corroborate the AFA rate. And the context of all this is a non-cooperative party. Yes, that is. But even non-cooperative parties, Your Honor, they have rights. And the department has clear responsibilities, as articulated by this court and Gallant and Kidd and other cases, that when they do their analysis and when they do their corroboration, it must be logical. And the rate they come up with must have a commercial relationship and a meaningful relationship to commercial realities. You're not objecting to the normal value corroboration, right? If you're speaking to their calculation in Russia. Yeah, where they've said that because of inflation, because of the Russian ruble, that the normal value figure for this one transaction is likely to have been conservative during the 07-08 period. Well, I do object to it. What's wrong with that part of it? Well, I do object to it in that they have been inconsistent throughout this review. If they want to say inflation in Russia has perhaps gone up, that suggests that home market prices might have gone up. There's no proof that that's happened. They're making that assumption. But on the flip side of that transaction, which was the... No, no, I just didn't understand. But stick with the normal value for a moment. Yes. So, have they sufficiently corroborated the normal value or not? I don't think they had to do that. I don't think they have sufficiently corroborated, especially in conjunction with what they did on the U.S. side, Your Honor. That's not an issue here, is it? What is that, Your Honor? They corroborated normal value. It is something that we did not write extensively about, but it isn't like we agreed with it either. Well, what is wrong with it? The normal value? Yes. Well, the normal value is that they made an assumption that because the exchange rates were in, inflation had gone up, that the prices must have gone up. So, I would concede it is not as flawed as their U.S. side. So, if you want me to say is it as bad as the U.S. side, I will stipulate to that. But where I think their case clearly breaks down is on the U.S. side. They use U.S. import statistics for 07-08, and they came up with a price of approximately $2.43. These are the prices reported to Customs, right? Yes, they are. This is public information? This is public information. They then compared that price to the gross unit price for the single transaction they used. They said, oh, the import statistics are even lower in 07-08 than the gross unit price was in 06-07. Therefore, there must have been even more extensive dumping in 2007-2008, and that was the extent of their cooperation. Well, and tell us what your problem with that is. I have three significant problems with that. First off, the transaction at issue in the 06-07 review was a CEP transaction. It reflected the selling price of Avisma to its U.S. importer, which then sold it to its customer. So, it is not an apples-to-apples comparison. They are comparing an import price in 07-08 to a CEP transaction in 06-07. So, it is not apples-to-apples. The second big issue is, it was clearly on the record. Before you go on to the second issue, now, the reason Commerce made this comparison the way it did is because if we are talking about the actual import data and actual pricing data, that data belonged to Avisma, and you withdrew all that data. Yes, we did, Your Honor. Yes, we did. They can go out and look for other information, but when they find that information, they have to make a logical connection between the facts on the record and the conclusions they reach. So, the first problem was it was not an apples-to-apples comparison. The second biggest issue... And it is not an apples-to-apples comparison because the prices that they are using to corroborate are prices charged to the U.S. affiliate. Is that correct? The import statistics reflect the prices from Avisma to its U.S. affiliate. Right. In the margin database, it was a CEP price to the next customer. Okay. Right. And so, we put on the record that there is a big delta between the entered value and the selling price. It is a normal assumption, and there was record evidence that showed exactly how much that delta was. It was huge. So, to assume that because you imported it at X that you would sell it at Y without accounting for that delta, we believe, is illogical. The biggest mistake we believe they made... Why isn't that sufficient to corroborate the entry value? Because you can't cherry-pick the assumptions you want to make. You must look at the record as it is. And one of the important things that is on the record is that we made a comparison between the entered value in 07-08 and 06-07. And there was a huge increase in the entered value between 06-07 and 07-08. That suggests that Ibiza's price has actually increased. Yet, the department reached the exact opposite conclusion by saying, we compared the 06-07 entered value to just the one CEP price that was on the record. And they made that leap that somehow the price had gone down. The record reflects during the two time periods, 06-07 to 07-08, U.S. import prices went up 25%. As I understand, what you're saying is that if you're going to compare 06-07 to 07-08, you ought to consider the affiliate pricing, if we can use that shorthand, in one period and compare it to the other. And what you're saying is that because the affiliate pricing went up by 25%, that doesn't suggest that the single transaction price from 06-07 is representative of the later period. That's correct. Prices went up 25% and how you reach a conclusion that there's more dumping basically floors it. The third big issue that they're facing is they didn't corroborate a margin. They corroborated a single gross unit price by looking at this U.S. import statistics. But there were 19 separate transactions in the 06-07 database that had the exact same gross unit price, not just the one with the 43.58%. So if you look at what they did, they tried to corroborate a single gross unit price. 19 transactions had that same price and the average dumping margin for those 19 transactions was significantly below the 43.58%. Does Commerce have to corroborate all potential alternatives or just the option it picked? They have to corroborate in a way that reflects commercial reality and the languages courts used in Kidd and Gallon, etc. You just can't pick a number and then go out here and say, let's find some assumptions to reach that number. If they corroborate that number, don't they meet our precedent? They're trying to corroborate a margin, Your Honor. And all they've done is cherry picked one number and said, oh, we're able to prove that by believing that despite an increase of 25% in import price, prices somehow went down. And so they are required to have a meaningful connection. We don't know there's a 25% increase in the real prices. All we know is there's a 25% increase in the prices reported for sales to the affiliates. That's correct. But how you can reach the assumption if the import prices have increased 25%, how you reach the conclusion that the Department did and the Justice Department did that the price actually went down seems highly illogical to me. So even if you buy this use of U.S. import statistics, which we believe is flawed because it's not apples to apples, they didn't account for the 25% and there's 19 other transactions. This is one of the few cases we've had lately that isn't Apple. Sorry. I'm not laughing just because you're a judge. I think that was a good joke. But the next thing I'd like to talk about, if it's possible, is that let's assume that they've gone and actually in their mind corroborated that number. But let's look at what the margin was that was calculated. It was 43.58%. That margin itself was based upon an aberrational outlier sale. And this court and the courts below us have never counted the selection of a single outlier number unless it's incredibly corroborated by other things. And usually that means there are other margins which are in the general vicinity. There has to be high volume transactions which also have margins either around it or usually above it. And in most cases this court has accepted as corroboration if 43% were the number, you would also find margins of 58, 57, or 31, or 32. Here it sticks out by itself. And there was a reason why that margin stuck out by itself. Out of 439 transactions of that type of merchandise, only two of them were half of loads. Magnesium is a heavy product. And only two of the transactions had half a load. So already it has a lower quantity than by far the vast majority of their transactions. It then had a huge freight cost that was three times higher than the other freight costs on the record. So I think everybody can agree that if you have one transaction that is 43% and the next lowest margin is significantly below that, and you can tie the fact that it's a half a load with an incredibly high freight cost, that gives you pause that that is an outlier, an aberrational margin in and to itself. So even if they were to try to corroborate a gross unit price, they haven't corroborated that high margin. You are well into your rebuttal time. You can save it or continue. I will save it. Thank you, Your Honor. Ms. Gerber is arguing for the government. And you are taking ten minutes. Yes, Your Honor. And so the timer is set for that, and then you'll yield to Mr. Jones. May it please the Court. Avisma is trying to take advantage of its own lack of cooperation, which is not supposed to happen under the application of adverse inferences. But you're also supposed to come up with rational corroboration for the numbers that you're using. I'm troubled by one aspect of this, and that is that you are ignoring the fact that the affiliate data submitted to customs, if we can use that shorthand, for 06-07 shows that the U.S. price was increasing, if you compare that same data to 07-08, correct? I would not say that Commerce ignored that information, Your Honor. But it is my statement of what it showed, correct? Not quite, Your Honor. Okay, what's the matter with what I said? The average import value, that price given to customs, in 06-07 we know that that happened, and it was priced to a U.S. affiliate. And, of course, the U.S. price that we care about is that first sale to an unaffiliated buyer. In 07-08, however, there's no information on the record what those sales were, whether they were, in fact, to a U.S. affiliate, or some of them may have been to unaffiliated buyers. How do you know that the 06-07 are affiliate prices? Because those were calculated. ABUSMA has that information on the record, and we do know that. It's in the record how that was calculated? Yes. So what you're saying is there might be a problem if the 06-07 and the 07-08 data were computed on the same basis, that that would show a 25% increase. But Commerce is saying you don't know that the 07-08 data was computed on the same basis as the 06-07 data. That's right, Your Honor. In addition, the relevant factor for calculating the margin isn't the sale to the affiliate. It's the sale to that first unaffiliated U.S. buyer. Well, that doesn't necessarily help you because you're using this as corroboration for the second thing, that is the sale to the U.S. importer. Yes, Your Honor. So, of course, it's not a perfect calculation, but what Commerce stated it was doing was using that import value from 07-08 as an estimate because it had no other information on the record. I understand that, but the problem is there seems to be, you're using it for that purpose, which may be fine, but the problem is if the 06-07 data and the 07-08 data were computed on the same basis, that showed a price increase, which would seem to destroy the corroborative value of the 07-08 data. Well, on the same basis, it's not possible to do so because Avisma took its information off the record. No, no, I understand. But hypothetically, if we knew that the 06-07 and the 07-08 data submitted to Customs were computed on the same basis, there would be a problem with the Commerce methodology, right? If we were aware, yes, if we were aware that those were the same number, the same apples-to-apples comparison, and we knew that we could calculate what the actual constructed export price would be, we wouldn't be in this situation. But we're in this situation because Avisma took its information off the record for the 07-08 period. So Commerce was bound to use the information that it had to corroborate the margin that it chose, but the fact that there wasn't better information, that's because of Avisma's own decision to take its information off the record in 07-08. What's your response to Avisma's argument that the transaction that was chosen was an outlier transaction and not connected to commercial reality? Well, first of all, we disagree. That's the conclusion. Avisma points to two factors for why this particular transaction was aberrational, that it was a low quantity and that it had high freight expenses. But those two factors, Commerce looked to them and thought, look, there are other low-quantity transactions, but they don't have the same type of margin. So the fact that it's a low-quantity transaction is not the driving force for why this is a high margin. Can you say low-quantity? Are you talking about half-load transactions? Approximately half, yes, Your Honor. So again, if it were aberrational, it would be because of that low quantity, and that's not what Commerce saw. Commerce looked to other transactions and said, look, this low quantity is not the driving factor. The same is true with the freight expenses. There were other transactions that also had high freight expenses, but the next highest freight expense was slightly lower, and its margin was vastly lower than the 43.58% margin. So again, Commerce looks to those numbers and says, the high freight expenses is not the driving factor of why this margin is high. But these two things that Avisma is looking at, it doesn't make this transaction aberrational. It doesn't show that this margin is different because of those two factors. And the fact that it's the highest margin itself does not make it aberrational. Commerce can certainly look to the highest margin, and it's a calculated margin used with Avisma's own prices. It's tied to Avisma's own experience in 06-07. And then Commerce corroborated that to the market reality. It wasn't only the highest margin. It was the only one in that neighborhood. Yes, Your Honor. More than twice anything else. Yes, Your Honor. Well, not more than twice anything else, but close to. Yes, Your Honor. Commerce determined that the 21.71% rate that it might otherwise use, because that was the calculated margin, the average margin from the investigation, it determined that that was not going to meet the purposes of adverse inferences, and therefore chose the 43.58% margin, and then had to corroborate it. The fact that it's the highest margin in and of itself doesn't make it inappropriate. Commerce has used the highest margin before in several other reviews of other products. What's the relevance of the idea of being an outlier? I'm sorry, Your Honor? I'm not a statistician. I'm not skilled in statistics. But I have the impression that when people are looking at a lot of data and there's an outlier, they may ignore the outlier. The relevance here is commerce does not want to use a transaction from the previous year that was different from the other sales in some way that made it different. So, again, if the low-quantity transaction made all of the related margins very high for whatever reason, then perhaps it would be an outlier, and it would be appropriate for commerce to consider another transaction. But, again, the input of the low-quantity, for example, did not make this an outlier. It was that Avisma was dumping at a high rate for that transaction. Was there any indication that that high transaction was made outside the normal course of business? I'm not aware of any information, Your Honor, no. It was just the highest margin that was calculated for that year. Now, one other thing I want to bring up before I run out of time is that Avisma has suggested that this rate is punitive. Commerce related this transaction, this chosen margin, to Avisma's reality in 07-08. It's not punitive because it's corroborated to the market realities of Avisma. Commerce is supposed to select a rate that is sufficiently adverse to encourage participation and to ensure that a party does not benefit from its non-cooperation, and that's what commerce did here. That's almost the definition of punitive. I'm sorry, Your Honor? Isn't that almost the definition of punitive? If you don't give us data, we're going to really sock it to you with the highest number we can find. Well, that's not what is happening here. Commerce is directed by the SAA and by that statute to pick a margin that is sufficiently adverse to encourage participation in future reviews. Now, obviously that means that it's going to have a slightly higher number than if it was just trying to calculate the most perfect number. Well, I'm saying in general, in all of the adverse rates that commerce ever gets. You're looking in these cases to get the highest number that might be supported by the record and rationality, right? Not necessarily, Your Honor. In this case, it was the highest transaction, but that's not commerce's purpose, and that's not what commerce attempts to do, and I see my time is up. So, we respectfully request that the court affirm the trial court's judgment. Thank you, Ms. Gerber. Mr. Jones for American Magnesium. Good morning. May it please the court? My name is Stephen Jones. I'm here on behalf of U.S. Magnesium. I'd like to go straight to Judge Dyke's question about the corroboration methodology and the concerns expressed. This is confusing because the information that we have is from the 0607 review. This review is the 0708 review. And Avisma would strip the record of its information in the 0708 review. But there is public information submitted to customs for 0708, just as there is for the 0607 period, and it's the same public information that commerce is relying on for corroboration that Avisma says shows an inconsistency. That's correct, Your Honor. But what we don't know, and what we don't know because Avisma took its information off the record, is the extent of the affiliated importer's markup in the 0708 review, the extent of any expenses on the U.S. side in the 0708 review. We don't know, and there's no way of knowing, what the final price to the customer in the 0708 review was because Avisma removed that information from the record. The 0708 data may have been reported on a different basis than the 0607 data. Well, I think originally it may have been reported on the same basis, but what we don't have anymore is information about the extent of the markup, the affiliate's profit, if any. We don't have any information about the expenses. So what Avisma is seeking from sovereign commerces and now seeking relief is a favorable inference, seeking a favorable inference from this court. When you suggest that it may have been reported on the same basis, you make me nervous because it sounds then as though there is an apples-to-apples comparison between 0607 and 0708. Your Honor, we don't know. Wait, wait, wait. Don't interrupt me. For the publicly reported data for the customs, it sounds as though the comparison they're trying to make between the customs data for 0607 and 0708 is a legitimate comparison. I thought the government was saying, no, no, we can't tell whether it's a legitimate comparison because we can't tell whether the data is reported on the same basis. That's right. That's correct. You formulated the government's position correctly. The government does not know, cannot know, because the information was removed from the record. And that's the whole issue here. I mean, that's why we're here. We're here because Avisma pulled its information off the record. We think that information in the record shows that the margin would be significantly higher than 43.58%. Avisma took that off the record and it believed it could get 21.71% as its rate. So Avisma now comes before the court asking for a very precise apples-to-apples calculation of its dumping margin when it pulled its information off the record. It was in control of whether it received an apples-to-apples precise dumping margin calculation. But the facts available provision in the statute and the corroboration provision are not designed to yield an apples-to-apples perfect dumping margin. What it's designed to do is enable commerce or require commerce to corroborate the rate to the extent practicable based on information reasonably at its disposal. But you say there are other ways of doing this. So maybe there was a better way to do it. Well, there is information on the record, Your Honor, showing that we believe corroborates the rate. Avisma's production declined by 45%. That sounds to me as though you're saying that commerce should have relied on those alternative basings that you offer in your brief, which seems to kind of undercut what they did. Well, we submitted that information for corroboration purposes. We submitted that information and put it before this court to increase the court's comfort level that in fact this rate of 43.58% is reasonable and is corroborated. I would like, before my time runs out, just to address the outlier question. The rate is not an outlier, but we submit that's the wrong question. The question is whether that rate reflects Avisma's commercial reality in the 07-08 review. The Gallin-Ocean case said the rate has to have some relationship to commercial reality, and it is the highest rate from the previous review. But the rate reflects Avisma's commercial reality in this review, and we would respectfully request the court to consider that and affirm the Department of Commerce. Thank you, Mr. Jones. Mr. Gurley has some rebuttal time, about two and a half minutes. Thank you again, John Gurley, for VSMPO Avisma. Just to clarify what the record says, we did withdraw our BPI information from the 07-08 review, but it remains on the record all of the public information we filed, including certified filings in our Sections A and C and D, which clearly demonstrate that the 07-08 review had CEP transactions. So for them to say they had no idea what kind of transactions those were is simply wrong. Avisma, throughout the course of its conduct from 04-05, 04-06, all of the reviews had virtually all CEP transactions. The record reflects it. Respond to the government's argument that your comparison between the 06-07 and 07-08 data submitted to Customs isn't a proper comparison because we don't know whether those two figures were computed on the same basis. Well, Your Honor, the 06-07 Customs cases were based upon information supplied by Avisma that we are required and certified, and required to certify, the entered value for every transaction we report. Well, that doesn't mean it was done accurately. We can't assume that it was done accurately just because... We received a margin, a calculated margin, so if you can't assume that's accurate, then you can't assume the 43.58% margin that they used is accurate either, Your Honor. No, but what I'm referring to is not so much the 06-07 data, but the 07-08 data, and the government says we're not sure that that's a legitimate comparison to the Customs data for 06-07 because we don't really know how the 07-08 data was computed. With all due respect, 07-08 data was information put on the record by the government itself, and that was Customs statistics. But it's based on statistics you reported to Customs, right? That's correct. So if you assume that Avisma was telling the truth in 06-07 and 07-08 about its entered value, and you want to use that data to inform a decision, then I think there's no basis for assuming that this is not correct information. All we do know is that when you make a comparison of the 06-07 entered value, which was certified, Commerce calculated margins, including the 43.58%, it shows a 25% increase in 07-08. Doesn't the Statement of Administrative Action actually support the use of the trade data that Commerce relied upon? Commerce can look at a wide variety of data. They can look at the petition. They can look at margins. They can look at import statistics. That's not our quibble here. Our quibble is how they use that information. The import statistics that were used, the Statement of Administrative Action says, you can use this information for corroboration purposes and for the establishment of dumping margins in a dumping investigation. That's absolutely correct, but it's how you use that information. The Statement of Administrative Action says you can use margins from a prior review as well. We don't disagree with that, but it's how you do the analysis. It has to reflect commercial reality. Remember here, from day one, the department chose the highest margin possible, the outlier sale, one load, highest freight. There were 16 other transactions between 21.71 and 43.65, 16 other transactions. They never answered the question, no matter how many times we've asked them, why wouldn't a deterrent of 23% have been sufficient, 25%, 28%. Why did they have to choose a deterrent which was 50% higher than the next highest margin? Could it be because that particular transaction had a higher rate of dumping involved? It clearly did have a higher rate of dumping because it had a half a load and a freight charge three to eight times higher than the other freight charges on the record. What is it in your argument that makes that transaction an outlier? Are you saying it was made outside its normal course of trade? Well, normally the term normal course of business applies to home market sales. I'm saying it from a corroboration point of view. If you're looking at 442 transactions and only one of them surpasses 43%, I think it doesn't take a leap of faith to say something about that transaction is odd. And this court has required in numerous other cases in PAM and KID, they want to have, if you're going to choose a margin, you need to have that margin corroborated by other margins around that in the same review. Usually there's high volume transactions above and below to assure yourself it's not just an outlier. This is the most outlier margin I think this court has ever seen that would even consider using for final AFA. I just don't think it makes sense. Thank you, Mr. Gurley. Thank you. We'll take a case on revising.